# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **DAVID STOTLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **8:04CV409** |
| **vs.** | ) | |
| | ) | **MEMORANDUM AND ORDER** |
| **JOHN E. POTTER, Postmaster** | ) | |
| **General, United States Postal Service,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the magistrate judge pursuant to 28 U.S.C. § 636 and the consent of the parties.

On April 5, 2003 plaintiff, David Stotler, was discharged from his position with the United States Postal Service (USPS) as a full-time Mail Processing Clerk. Stotler appealed his discharge to the Merit Systems Protection Board (MSPB), which affirmed Stotler's termination. He then sought administrative relief from the Equal Employment Opportunity Commission (EEOC), which declined to consider the petition. Stotler then brought this suit against the Postmaster General of the United States in his official capacity,[1] raising claims

---

[1]Federal employees asserting Title VII claims must exhaust their administrative remedies as a precondition to filing a civil action in federal district court. Generally, the employee must seek relief from the Equal Employment Opportunity department of the employing agency, as required by 42 U.S.C. § 2000e-16(c). In some cases, as in this case, a federal employee may instead assert their related Title VII claims in connection with an appeal to the MSPB, an independent, quasi-judicial federal administrative agency established to review civil service decisions. *See* 5 U.S.C. § 7701. These are considered "mixed cases" and are governed by the procedures outlined in 5 U.S.C. § 7702. The MSPB's jurisdiction is limited to the review of specific "appealable actions," which include demotions and removals, *see* 5 U.S.C. § 1201.

under § 717 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16,[2] the Freedom of Information Act, 5 U.S.C. § 522 (FOIA), and the Privacy Act, 5 U.S.C. § 552a(g)(1).

Now pending for decision are Filing No. 43, the defendant's motion to dismiss plaintiff's FOIA and Privacy Act claims as moot and for summary judgment on plaintiff's Title VII claim and claim for review of the MSPB decision; and Filing No. 46, plaintiff's motion to supplement and/or expand the administrative record of the MSPB proceeding.

## I.  JURISDICTION AND VENUE

This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Venue in this district is proper under 28 U.S.C. § 1391.  The plaintiff has exhausted all administrative prerequisites to filing suit.

## II.  MOTION TO DISMISS THE FOIA AND PRIVACY ACT CLAIMS

Stotler's FOIA and Privacy Act Claims involve seven (7) pages of documents.  Five pages consist of a cover memo forwarding the statements of four co-employees regarding Stotler's behavior in the workplace.  The other two (2) pages were provided to plaintiff's attorney on or about February 2, 2005 by present defense counsel.  Those pages consist of printed e-mail messages circulated among Stotler's supervisors in February 2003 discussing

---

[2]Stotler's employment with USPS included work at a detached mail unit located inside a warehouse owned by Cabela's, Inc. located in Sidney, Nebraska. On February 24, 2003, Cabela's requested that USPS no longer allow Stotler to be assigned work on Cabela's premises.  Stotler invoked the Court's supplemental jurisdiction to pursue state law claims for negligent infliction of emotional distress and tortious interference with his employer-employee relationship. Those claims were dismissed by Judge Smith Camp for lack of subject matter jurisdiction.

the complaints of Stotler's behavior in the workplace.  The chain of e-mails indicates that the information was forwarded by  a regional Human Resources Manager, Jeanette Moser,  to members of a Threat Assessment Team (TAT) for discussion and evaluation.  Stotler now acknowledges he received all the documents but insists he is entitled to an award of attorney's fees because the documents were not produced immediately upon request.

The record shows that the USPS ultimately withheld the seven (7) pages pursuant to FOIA exemptions 5, 7(C) and 7(F).  The FOIA does not apply to matters that are:

(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency; [or]

* * * *

(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information   ... (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, [or] (F) could reasonably be expected to endanger the life or physical safety of any individual[.]

5 U.S.C. § 552(b).

My review of the documents in question shows that the grounds for non-disclosure were reasonable and consistent with applicable law. These documents discuss interpersonal conflicts between Stotler and co-employees, including the employees' perceived threats by Stotler, and address resolution of the problems.  These are the type of documents the FOIA exemptions were designed to protect.  They depict frank discussions among individuals, designed to assist agency decisionmakers in responding to a problem.  After thorough

-3-

examination of the documents, the court concludes that the documents were all exempt from disclosure under Exemptions 5, 7(C) and 7(F).

Regarding attorney's fees, FOIA, 5 U.S.C. § 552(a)(4)(E), provides: "The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed." Here, it does not appear to me that the complainant has substantially prevailed, as the documents in question need not have been produced. In any event, the five pages comprising the statements of complaining co-employees were voluntarily produced during the MSPB proceeding and are part of the administrative record, although the final two pages were probably produced as the result of this litigation.

Even assuming that Stotler is eligible for (as opposed to entitled to) an award of attorney's fees,

> Among the factors which the court should consider when determining a prevailing litigant's entitlement to attorneys' fees under FOIA are: (1) the benefit to the public to be derived from the case; (2) commercial benefit to the complainant; (3) the nature of the complainant's interest in the records which he seeks; and (4) whether the government's withholding of the records had a reasonable basis in law.

*Miller v. United States*, 779 F.2d 1378, 1389 (8th Cir. 1985). As the court in Miller observed, "Probably the most important consideration in determining entitlement to fees in a FOIA case is the benefit to the public which is to be derived from release of the information sought. The underlying purpose of FOIA is to ensure that government is conducted in the open." *Id.*

-4-

In this instance, the disclosure of these documents was of no benefit to the general public, was of no commercial benefit to the plaintiff, and the USPS had a reasonable basis in law to withhold the documents. Under these circumstances, I find that Stotler is not entitled to an award of attorney's fees with respect to his FOIA and Privacy Act claims.

The fact that all the documents were exempt from disclosure, combined with the fact that Mr. Stotler has received each and every document he requested and my finding that Mr. Stotler is not entitled to any award of attorney's fees on his FOIA and Privacy Act claims compels me to reach the conclusion that the FOIA and Privacy Act claims should be dismissed as moot.

### III.  MOTION TO SUPPLEMENT AND/OR EXPAND THE ADMINISTRATIVE RECORD

Stotler asks that the administrative record of the MSPB proceeding be supplemented to include:

Exhibit A –   A series of e-mail messages circulated among Stotler's supervisors between February 19 and February 21, 2003 discussing the complaints of Stotler's behavior in the workplace. These are the two pages that the USPS did not disclose in the MSPB proceeding or pursuant to Stotler's FOIA and Privacy Act requests.

Exhibit B –   A confidential document captioned "Threat Assessment Team Case Management System" dated 3/14/03 memorializing a "2/20/03 email conference" regarding a Threat Assessment Team (TAT) investigation of Stotler's behavior in the workplace.

Exhibit C –   A Hostile Work Environment Investigation report regarding Stotler's allegations of harassment against his supervisor and others, based on their failure to give him a requested work assignment, and a clerical mistake made with respect to Stotler's request for sick leave.

These documents were not provided to Stotler in response to discovery during the administrative processing of his appeal to the MSPB.

Citing 5 U.S.C. § 7703 and *Voyageurs Nat'l Park Assoc. v. Norton*, 381 F.3d 759, 766 (8th Cir. 2004), defendant opposes the request because the district court is supposed to review MSPB decisions on the basis of the administrative record and can only look outside the administrative record when the record is incomplete or if the agency acted in bad faith.

Although the defendant's position is probably the correct position on this issue, I will grant the plaintiff's motion and consider the documents comprising Exhibits A, B and C to the extent they are relevant to the MSPB proceeding.

### IV.  MOTION FOR SUMMARY JUDGMENT – CLAIMS FOR DISCRIMINATION

#### A.  STANDARD OF REVIEW

#### 1.  Review of Administrative Decision

In this mixed case, in matters not involving discrimination, the court's inquiry is limited to determining whether the MSPB's findings are:

(1)   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2)   obtained without procedures required by law, rule, or regulation having been followed; or

(3)   unsupported by substantial evidence.

5 U.S.C. § 7703(c).  With respect to discriminatory factors, however, the court need not defer to the MSPB and must review discrimination claims *de novo*.  *Id.*; *Crawford v. Runyon*, 37 F.3d 1338, 1340 (8th Cir. 1994).

-6-

## 2. Summary Judgment Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Gilooly v. Missouri Dep't of Health & Senior Serv.,* 421 F.3d 734, 738 (8th Cir. 2005). "In making this determination, the function of the court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely, to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Dulany v. Carnahan*, 132 F.3d 1234, 1237 (8th Cir. 1997) (quoting *Anderson*, 477 U.S. at 248).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact. *See Tenbarge v. Ames Taping Tool Sys., Inc.*, 128 F.3d 656, 657-58 (8th Cir. 1997). Accordingly, a party moving for summary judgment must "set forth in the brief in support of the motion for summary judgment a separate statement of each material fact as to which the moving party contends

-7-

there is no genuine issue to be tried and as to each shall identify the specific document or portion thereof or discovery response or deposition testimony ... which it claims established the fact."  NECivR 56.1(a).

In the face of a properly supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998) (quoting Fed. R. Civ. P. 56(e)).

A nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather, must set forth specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 922 (8th Cir. 1998).   In this respect, the nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts;' ...  [i]t must show there is sufficient evidence to support a jury verdict in [its] favor."  *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998).  Accordingly, the nonmoving party must "set forth in its opposing brief a separate statement of each material fact as to which it is contended there exists a genuine issue to be tried and as to each shall identify the specific document or discovery response or deposition testimony ... which it is claimed establishes the issue."  NECivR 56.1(b).

-8-

### B.  FINDINGS OF FACT

I find that the following facts are uncontroverted for purposes of the MOTION FOR SUMMARY JUDGMENT and constitute the material facts upon which a resolution of these issues must be premised.

1.     The plaintiff, David Stotler, was employed by the U.S. Postal Service (USPS) from March 4, 1995 through April 5, 2003, as a full-time Mail Processing Clerk at the U.S. Post Office in Sidney, Nebraska.  As part of his job, he also worked at a detached mail unit (DMU) located inside the Cabela's warehouse in Sidney.

2.     Deborah Deal was the Supervisor of Customer Service at the Sidney Post Office and was Stotler's immediate supervisor.  Thomas Lliteras was the Officer-In-Charge at the Sidney Post Office and was Deal's immediate supervisor.  Gail Duba was the Manager of Post Office Operations and was Lliteras' immediate supervisor.

3.     On or about April 9, 2001, Deborah Deal issued Stotler a Letter of Warning for Unacceptable Conduct – Unauthorized Use of Postal Service Computer.  The Letter of Warning charged that on March 17, 2001, Stotler, while in pay status, used a Postal Service computer to view pornography sites on the Internet for a period exceeding two hours.

4.     Stotler was issued a seven-day suspension dated April 11, 2002, by Supervisor Deborah Deal and Postmaster Ken Gudahl for Unacceptable Conduct – Absent Without Leave (AWOL) after leaving his scheduled shift three hours early on March 26, 2002, without timely notifying or seeking permission from his supervisor.

5.     On or about December 27, 2002, Stotler wrote a letter to "Deb Deal, Acting Postmaster," complaining that Deal was creating a hostile work environment directed at Stotler.  Stotler described the "hostile work environment" as a condition caused by Deal's ignoring him.  "The reason for this allegation is that anytime that I request time off or bring a problem to you that you will ignore me and let the problem continue." (AR 349).  Stotler's letter expressed his dissatisfaction in Deal's refusing to award him a requested work assignment and complaining that, "In accordance of local agreement this request should have been approved." *Id.*  Deal was the only person Stotler claimed had created a hostile work environment.  Nowhere in the December 27, 2002 letter is there any allegation that Stotler was subjected to a hostile environment or discrimination based on race, color, sex, religion, or national origin.

6.     In January 2003, Gail Duba received a copy of the letter written by Stotler alleging a hostile work environment.  During the investigation of Stotler's hostile work environment claims, Duba met with Stotler on January 10, 2003.  They discussed Stotler's behaviors at work.  During that discussion, Stotler and Duba agreed that Stotler's claim did not rise to the level of a hostile work environment.  Stotler and Ms. Duba outlined a plan for resolution.  Stotler was satisfied with the resolution of his hostile work environment claim.

7.     On February 13, 2003, USPS management in Sidney, Nebraska was informed that a poster had been hung at the Main Post Office and the DMU located at Cabela's. The poster was entitled "Stamp Out Ratting Month" and included the statement "Do [sic] To The

-10-

Overwhelming Popularity Of This Program With Loyal Brothers & Sisters We Are Extending It For As Long As It Takes To Do The Extermination."[3]   Several USPS employees, but not all of plaintiff's co-employees, were concerned and offended.   Stotler admitted to hanging this poster at the DMU, but did not admit hanging the poster at the Main Office.   *See* AR 351-52.

8.   Stotler served as a local union steward for American Postal Workers Union members in the area surrounding Sidney, Nebraska.   He pursued grievances on behalf of union members, as well as pursuing grievances and filing complaints "concerning not being allowed sufficient time to pursue grievances by Supervisor Deal."   These complaints were presented to Gail Duba for resolution.

9.   On February 6, 2003, Stotler presented USPS management with a complaint entitled "Discrimenation [sic] Towards Union Steward," a memorandum concerning the

---

[3]The full text of the poster (*see* AR 179) is as follows:

**Stamp out Ratting Month!!!**
**Please Help Stamp Out All Ratting Out Of Our Union Brothers & Sisters To Management.  This Only Weakens Our Union!  You Know What I Mean-Members That Talk To The Supervisor And Say Something Like This, "I'm The Only One Doing Any Work" Or "I Don't Know Where So & So Is I Haven't Seen Him/Her for Awhile Now", Or (Right In Ear Shot of the Supervisor) "Time To Wake Up." We Could Go On, But You Get The Picture. This Is Also Called: "Snitching", "Throwing People In," "Brown Nosing", "Kissing The Supervisor's Ass" & A Few Other Terms I Can't Mention On This Site. So Please Lets All Join Together To Help Stamp Out This Dreaded Disease & Cure The Inflicted.**
**"Do To The Overwhelming Popularity Of This Program With Loyal Brothers & Sisters We Are Extending It For As Long As It Takes To Do The Extermination.**

discriminatory treatment that continued to be directed toward him by his supervisor, Deb Deal.

10.   On February 19, 2003, Supervisor Deborah Deal issued Stotler a 14-day suspension for Unacceptable Conduct – Offensive Conduct, in which Gail Duba concurred. The discipline was in response to allegations that on January 24, 2003, Stotler was observed raising his first three fingers and yelling at a Cabela's employee to "read between the lines." The suspension letter stated that Stotler's past discipline, which included his seven-day suspension and his letter of warning, was a factor in the decision to suspend Stotler for 14 days.

11.   On February 19, 2003, while still investigating the origin of the posters found at the DMU and the Main Office, Mr. Lliteras was notified that Stotler brought a book entitled "Going Postal: The Tip of the Iceberg" to work and left it on a table in the area accessible by USPS employees and Cabela's employees. Chapter 5 of the book was entitled, "Assassination for Jaywalking."

12.   In light of the facts the poster spoke about "exterminating" employees, and the book entitled "Going Postal: The Tip of the Iceberg" just days later was placed in the work area, Stotler's co-workers became concerned.  An investigation into the book and Stotler's intentions revealed that Stotler questioned at least one of his co-workers and tried to coerce her into reading the book.  Mr. Lliteras notified his supervisor, Gail Duba of the situation and discussed placing Stotler in emergency off-duty status.

13.   On February 19, 2003, Lliteras notified Stotler that he was being placed in emergency off-duty status, without pay, pending an investigation of the report that he brought unacceptable reading material into the Post Office and placed it in the break area at a time when he was also being investigated for hanging the "Stamp Out Ratting Month" poster at the Cabela's DMU.

14.   The USPS has been plagued many years with the "Going Postal" term.  The phrase "going postal" is commonly used when people talk about employees using violence and sometimes deadly violence to make a point at work, or to end their frustration in the workplace.

15.   The USPS issued a "Zero Tolerance" policy in January 2003.  The Policy states that "any employee who makes a threat of physical violence will be taken seriously and the threat will be dealt with immediately and effectively.  A threat is defined as any statement that indicates an intent to do bodily harm to another . . .  Words or actions intended to provoke, intimidate or imply a threat may also be considered under this policy."  The Policy directs that the supervisor, manager, or postmaster in charge "will place the employee making the threat in an off-duty status without pay pending investigation and instruct the employee not to return to work until notified by management to do so."  The Policy further states that threats are serious offenses and that removal is normally warranted.

16.   As required by the USPS policy, Gail Duba notified Jeanette Moser, Human Resources Manager, of the incidents involving Stotler.  Duba sought advice from Moser on

-13-

placing Stotler in emergency placement.  Moser is also a member of the USPS's Threat Assessment Team (TAT), which was established by the USPS to assist in assessing threatening situations and minimize the potential risk for violence.  Duba contacted Moser in her capacity as Human Resources Manager only and made no request that Stotler's conduct be submitted to the TAT for consideration.

17.   In addition to the conversation with Gail Duba, on February 19, 2003, Jeanette Moser was copied on an e-mail that Ms. Duba sent to a USPS Labor Representative outlining Stotler's behavior.  On February 20, 2003, Jeanette Moser received a message from her secretary that Tom Lliteras had telephoned to tell her about issues concerning Stotler.

18.   As a result of Jeanette Moser's conversation with Gail Duba, the e-mail she received, and the telephone message from Tom Lliteras, Ms. Moser felt Stotler's actions should be referred to the TAT for review. On February 20, 2003, Ms. Moser sent an  e-mail to the other TAT members informing them of Stotler's actions.

19.   Available core members of the TAT reviewed the information regarding Stotler's actions and felt that, given the possibility of removal as a disciplinary option for Stotler, that Stotler had been referred to the Employee Assistance Program, and that Stotler showed a calm demeanor during a meeting with Gail Duba, there did not appear to be immediate cause for concern of violence.  Therefore, the TAT took no action to recommend immediate removal of Stotler from the workplace as an abatement.  Instead, the TAT chose to monitor the situation pending any disciplinary action Stotler might receive.

-14-

20.   On February 24, 2003, Tim McAreavey, the Corporate Logistics Manager for Cabela's, sent a letter to Tom Lliteras expressing concern over Stotler's behavior and requesting that Stotler no longer be assigned to work on any Cabela's premise.  Cabela's is one of the USPS' largest mailers, spending over $54 million annually shipping their products through the U.S. Postal Service.

21.   Stotler and Gail Duba met between Stotler's emergency off-duty placement of February 19, 2003, and his removal from the USPS on April 5, 2003.  Stotler admitted that he was trying to intimidate other employees and even scare them with the posters and book.  Stotler shared that he was tired of his co-workers writing notes to the supervisor.  During these discussions between February 19, 2003, and April 5, 2003, Duba encouraged Stotler to seek professional help through the Employee Assistance Program (EAP), through a Veteran's Affairs representative, or through other community organizations.  Duba also advised that help through EAP was also available to his family.

22.   On March 5, 2003, Tom Lliteras issued Stotler a Notice of Proposed Removal (AR 139) on a charge of "Unacceptable Conduct" which outlined as reasons for the discipline: (1) the "Stamp Out Ratting Month" poster which Stotler admitted to hanging at Cabela's to let his co-workers know that he wanted them to stop sending notes to the Supervisor about him; and (2) the book entitled, "Going Postal: The Tip of the Iceberg" which Stotler brought to work and asked another co-worker to read.  Lliteras' letter advised

-15-

Stotler that his actions were in violation of the following provisions of the Employee and

Labor Relations Manual (ELM):

### 661.3  Standards of Conduct
Employees must avoid any action, whether or not specifically prohibited by
this code, which might result in or give the appearance of:

c.     Impeding Postal Service efficiency or economy.

f.     Affecting adversely the confidence of the public in the integrity of the
Postal Service

### 661.53  Unacceptable Conduct
No employee will engage in criminal, dishonest, notoriously disgraceful or
immoral conduct, or other conduct prejudicial to the Postal Service.

The March 5, 2003 notice also advised that Stotler's past record was considered in reaching

the decision to propose Stotler's removal, including: (1) a letter of warning issued on April

9, 2001, for Unacceptable Conduct–Unauthorized Use of a USPS Computer; (2) a seven-day

suspension issued on April 11, 2002, for Unacceptable Conduct–AWOL; and (3) the

fourteen-day suspension issued on February 13, 2003, for Unacceptable Conduct.[4]  Stotler

was advised that he would receive a written decision from Ms. Duba.

23.    As Gail Duba prepared to make a decision on Stotler's proposed removal, she

began by reviewing Stotler's postal career.  She also spent time speaking with Stotler's

supervisor, Deborah Deal; the Officer-In-Charge, Tom Lliteras; and the previous Postmaster,

Kenneth Gudahl.  She reviewed current/active discipline of record; and reviewed the

"Douglas Factors" relative to an adverse action.  Her resulting memorandum (AR 133-137)

---

[4]The February 13, 2003 suspension had not been completed because Stotler's related grievance
had not been resolved.

-16-

notes that Stotler's active discipline included a Letter of Warning, a seven-day suspension, a 14-day suspension, and a job discussion. Stotler's behaviors displayed relative to the poster and reading material were unacceptable in the workplace. Rather than taking verbal warnings and written warnings and suspensions relative to his behaviors and conduct seriously, Stotler continued to display and take part in behaviors that were unacceptable in the workplace.

24.   On April 2, 2003, Gail Duba issued a Decision Letter (AR 115-117) to Stotler notifying him that after considering the facts and documents at hand and all other evidence of record, she found that his actions warranted his removal from the USPS. The Decision Letter outlined the reasons for Ms. Duba's decision, which included: (1) the "Stamp Out Ratting Month" poster that was found to be offensive to other USPS employees and to Cabela's management; and (2) the book entitled "Going Postal: The Tip of the Iceberg" which Stotler brought to work and placed in an area accessible not only to postal employees, but also to Cabela's employees and customers. Duba found it "asinine that you would bring the type of materials to such an important Postal Service Customer's building." AR 116. Duba's Decision Letter noted that Stotler had been given plenty of time to improve his behavior, as he was issued a letter of warning in April 2001, a seven-day suspension in April 2002, and a 14-day suspension in February 2003. Duba also  had a job discussion with Stotler regarding his behaviors in January 2003. Duba opined that none of the lesser disciplines had impressed upon Stotler the need to change his behaviors.

-17-

25.   Duba's decision to remove Stotler from the USPS was not based on retaliation for complaining of discrimination or hostile work environment, or in retaliation for engaging in union activities.  Rather, it was based on Stotler's failure to improve his behavior despite previous disciplinary measures, and his admitted attempts to scare or intimidate other employees because he was tired of them writing complaints about him to the supervisor.  (*See* AR 134).

26.   Stotler's employment was terminated effective April 5, 2003.

27.   During his employment by USPS, Stotler was given veteran's preference rights as a result of 20 years of military service followed by eight years of USPS service. Consequently, he was allowed to appeal his termination to the U.S. Merit Systems Protection Board (MSPB) and, on or about April 30, 2003, Stotler filed a "mixed case" appeal with the MSPB.

28.   A hearing was held on July 31, 2003 before the MSPB.   The MSPB Administrative Judge issued an initial decision on October 15, 2003 affirming the USPS's removal action.

a.   During the July 31, 2003 hearing, Stotler testified that he had a poor working relationship with his immediate supervisor, Deborah Deal, because he was ignored when he tried to approach her on "any type of situation" such as requesting steward time or obtaining information about grievances. (TS 212:5-13).  He testified he believed Deb Deal was treating him differently than other employees

> Because I had come to where I had heard that a window clerk had originally set up an appointment to – for a doctor's appointment. His appointment got canceled, so they were able to work other people's schedules so that this person could work.

TR 215:24-216:4. He believed other employees received preferential treatment on getting certain schedules; "whereas when I submitted a union steward request, to me, that was being ignored ..." (TR 217:9-11).

b.   Stotler testified that he put up the "Ratting Out" poster because other employees were sending complaints about him to Deb Deal; he believed they were obligated to resolve their problems with him directly. (TR 225:20-226:11; 227:14-19). He posted the document at the DMU because he "wanted the individuals that were sending the notes to, to stop, because I thought it was inappropriate for the notes to be sent." (TR 227:2-5). He guessed he had not ever been disciplined due to a note or complaint sent to a supervisor by a co-employee. (TR 258:13-259:4).

c.   Stotler acknowledged on cross-examination that three days after putting up the "Ratting Out" poster, he returned to work with the book entitled "Going Postal." He admitted that the phrase "going postal" can have a negative connotation that some people might interpret as a person "ready to shoot up a place" or become violent. (TR. 245:7-24).

d.   Stotler admitted on cross-examination that the agency did not commit any procedural error with respect to the January 10, 2003 meeting with Duba.

29.    During the discovery process in the MSPB proceeding, Stotler requested certain

information from the USPS, including the following interrogatory:

> Did the USPS ever cause any person to investigate any aspect of [Stotler's] job
> performance or conduct, including any investigation by any Postal inspector?
> If your answer is anything other than an unqualified "no," please identify the
> investigator, state whether he/she issued a report (written or unwritten) to you,
> and produce copies of each such report.

Gail Duba responded that the correct answer to the interrogatory was, "no"; however, at the

hearing before the MSPB Administrative Judge, USPS witnesses admitted that the Postal

Inspection Service, i.e., the TAT, had been contacted in response to Stotler's alleged

"unacceptable conduct."

30.    Stotler's petition for review was considered by the Merit Systems Protection

Board which entered its Final Order on May 13, 2004 denying the petition.

31.    Following the initial MSPB hearing, pursuant to the Freedom of Information Act

(FOIA), Stotler requested copies from the USPS of any documents created as a result of the

Postal Inspection Service investigation of his conduct in February 2003.  On May 26, 2004,

the U.S. Postal Inspection Service denied Stotler's requests under FOIA and the Privacy Act.

The denial letter set forth various exemptions under FOIA and the Privacy Act as the bases

for denial of the document production request. There were a total of seven (7) pages of

records relevant to the request exempt from disclosure.  Stotler exhausted his administrative

remedies following denial of his document requests under FOIA and the Privacy Act.

32.   Of the seven (7) pages of records relevant to the request which U.S. Postal Inspection Service deemed exempt from disclosure, Stotler had five (5) of those pages available to him at the time of the MSPB hearing and those pages are part of the Administrative Record.  The additional two (2) pages exempt from disclosure were produced by counsel for the United States during the discovery phase of this litigation via e-mail on or about February 2, 2005.

33.   Postal Inspector Perry Mitchell of the Omaha, Nebraska office was contacted by someone regarding Stotler's situation in February 2003.  Neither Inspector Mitchell nor anyone in the Omaha Postal Inspection office opened or worked a file regarding Stotler's conduct.  Mitchell did not officially investigate Stotler's conduct but maintained some handwritten notes and copies of a few documents regarding Stotler in the event that Stotler did something additionally to warrant an investigation.

## C. CONCLUSIONS OF LAW

### 1.   De Novo Review of Claims Alleging Discrimination

Plaintiff's retaliation claims are based on  § 717 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, which provides in pertinent part:

**(a)   Discriminatory practices prohibited; employees or applicants for employment subject to coverage**
All personnel actions affecting employees or applicants for employment ... in the United States Postal Service ... shall be made free from any discrimination based on race, color, religion, sex, or national origin.

-21-

Plaintiff alleges the USPS discriminated against him (a) in retaliation for complaining of discrimination and a hostile work environment and (b) in retaliation for engaging in union-related activities as a union steward.

There is no direct evidence of retaliation. Consequently, the court must apply the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005) (citing *Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1078 (8th Cir. 2005)).

> Under this burden-shifting framework, the plaintiff first must demonstrate a prima facie case of retaliation. If the plaintiff presents a prima facie case of retaliation, the burden shifts to the employer to rebut the plaintiff's prima facie case by articulating a legitimate, non-discriminatory reason for its adverse employment decision. If the employer successfully makes this showing, the burden shifts back to the plaintiff to show the employer's proffered reason was a pretext.

*Kasper*, 425 F.3d at 502 (internal citations omitted).

### a.  Prima Facie Case

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show that he "engaged in protected conduct, that he suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct." *Griffith v. City of Des Moines*, 387 F.3d 733, 735 (8th Cir. 2004).

*(1) Protected Conduct*.  The defendant concedes that Stotler has met the first element

of a prima facie case for retaliation by alleging he suffered retaliation because he complained

of "discrimination."[5]

The court agrees with the defendant, however, that participation in union-related

activities as a union steward does not constitute "protected conduct" under Title VII.  Union

activities "are not protected by Title VII, but by other, independent provisions of federal

---

[5]The record, however, is devoid of any evidence that Stotler suffered any retaliation or discrimination "based on race, color, religion, sex, or national origin."  In *Jones v. United Parcel Serv.*, 411 F. Supp. 2d 1236, 1258-59 (D. Kan. 2006), which included a retaliation claim under the Americans With Disabilities Act (ADA), the court noted:

In unpublished cases, the Tenth Circuit has found that when a grievance or other activity does not allege discrimination, it does not constitute either protected activity or protected opposition.  *See Hounton v. Gallup Indep. Co.*, 113 Fed. Appx. 329, 334 (10th Cir. 2004) (filing of police report not activity when report does not refer to discriminatory activity); *Anderson v. Acad. Sch. Dist. 20*, 122 Fed. Appx. 912 (10th Cir. 2004) (grievance did not allege mistreatment based on race); *Robbins v. Jefferson County Sch. Dist. R-1*, 186 F.3d 1253 (10th Cir. 1999) (testimony in arbitration hearing not protected activity when it did not concern discrimination), abrogated on other grounds; *Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 985 (10th Cir. 1991) (grievance which did not allege discrimination not protected activity), *overruled on other grounds* by *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220 (10th Cir. 2000); *see also Moore v. United Parcel Serv., Inc.*, 150 Fed. Appx. 315 (5th Cir.2005) (grievance which alleged violation of agreement with union but not race discrimination not protected activity); *Tiedeman v. Neb. Dep't of Corrs.*, 144 Fed. Appx. 565 (8th Cir. 2005) (grievance about pay rate based on union contract, not sex discrimination, not protected activity).  Here, plaintiff's grievances focus on a contract complaint–alleged violations of the CBA. His first grievance asserts that defendant violated Article 20 of the CBA by not allowing him to return to work.  His second grievance claims that defendant interfered with the third doctor procedure (an act expressly prohibited by Article 20 of the CBA) which then rendered an unfair result. Plaintiff cites no evidence that he filed his grievances because he believed that defendant had discriminated against him under the ADA. In fact, neither of plaintiff's grievances reference discrimination of any kind, and the Court therefore concludes that plaintiff did not engage in protected opposition to discrimination.

*Jones*, 411 F. Supp. 2d at 1259 (D. Kan. 2006).

Since Stotler's underlying allegations of discrimination have absolutely nothing to do with race, color, religion, sex, or national origin, I do not believe the plaintiff has met this element of the prima facie case but will assume, without deciding, that he has.

-23-

law." *Lee v. United States Postal Service*, 882 F. Supp. 589, 595 (E.D. Tex. 1995); *see also Onofrei v. General Sec. Serv. Corp.*, No. 04 C 5560, 2005 WL 3312599 at *9 (N.D. Ill., Dec. 5, 2005); *Ward v. State of Florida*, No. 4:01CV478, 2002 WL 31084918 at *5 (N.D. Fla., Aug. 8, 2002) ("Representing other union members as a union steward and pursuant of personal union grievances, although protected by the First Amendment, are not expressive activities protected by Title VII."). *Cf. Tiedeman v. Nebraska Dep't of Corr.*, No. 04-3731, 144 Fed. Appx. 565, 502 (8th Cir., July 20, 2005) (Because plaintiff's grievance and complaint were based solely on complaints that her union contract was not being honored, the activity complained of did not constitute a practice "made an unlawful employment practice" under Title VII or a "proceeding under or related to" the Fair Labor Standards Act.).

### (2)   *Adverse Employment Action*

The defendant concedes that Stotler has met the second element of his prima facie case in that he was terminated from his employment with the USPS.

### (3)   *Causal Link Between Adverse Action and Protected Conduct*

The defendant argues that Stotler has failed to establish the third element of his prima facie case because he has not shown any causal connection between his removal and his complaints of a "hostile work environment."   Based on my de novo review of this proceeding, I concur.  The record, even as supplemented, does not support an inference of discrimination or "hostile work environment" based on race, color, religion, sex, or national origin.  The record does not even support an inference of discrimination or retaliation for

Stotler's professed union activities and other conduct he believes is (but is not) protected under Title VII. The record strongly supports the inference that Mr. Stotler's employment with the USPS was terminated because he was the subject of a steady stream of complaints and disciplinary problems, the most recent of which were the result of Stotler's attempts to silence his co-workers' complaints to management about his inappropriate behavior.

### 2. Review of Agency Decision

In his Fourth Claim for Relief (Complaint ¶¶ 68-72), Stotler requests review of the administrative decision of the MSPB, arguing that the MSPB's decision is "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law; obtained without procedures required by law, rule or regulation having been followed; or unsupported by substantial evidence" because (1) the initial decision erroneously concluded that Plaintiff was removed on the charge of unacceptable conduct when Plaintiff was considered to have engaged in the intentional misconduct of intimidating or threatening coworkers, for which Plaintiff was not charged and which charge was not proved; (2) the MSPB improperly failed to resolve witness credibility issues; (3) the deciding official and the initial decision failed to properly consider mitigating factors relevant to determining the reasonableness of the penalty; (4) the initial decision erroneously concluded that Plaintiff's conduct was not protected by the U.S. Constitution, Union contract, and agency regulations; and (5) the initial decision erred as a matter of law in concluding that Plaintiff failed to prove a nexus between his protected conduct and his removal from employment.

-25-

Under 5 U.S.C. § 7703(c), the court must affirm the administrative decision unless it was "arbitrary, capricious, an abuse of discretion, procedurally infirm, or not supported by substantial evidence." *Crawford v. Runyon*, 37 F.3d. 1338, 1340-41 (8th Cir. 1994).

The Initial Decision and Final Order of the MSPB were attached to the plaintiff's complaint. The Initial Decision (AR 486-501), written by Administrative Judge Laura M. Albornoz, discusses the hearing testimony in great detail. Judge Albornoz observed that Gail Duba provided a detailed explanation in her April 2, 2003 Decision Letter as to why she decided to uphold the removal action against Stotler. From talking to Stotler, Duba understood that "he intended to intimidate his coworkers to stop sending notes to Deal," and decided to remove Stotler based on his conduct, not based on any threats that he made. Judge Albornoz "[did] not find that the USPS charged Stotler with making a threat and [did] not find that Duba considered [Stotler] to have made a threat when she made her decision to remove." Rather, Duba considered Stotler's conduct in posting the "Stop Ratting Out Month" sign and showing the "Going Postal" book to his co-workers at the DMU was unacceptable because Stotler was attempting to change their behavior with intimidating signs and literature.

Judge Albornoz also noted Stotler's prior disciplinary problems. She noted that the 14-day suspension imposed on February 19, 2003 was issued on the same day Stotler was escorted from the Cabela's facility; he could not serve that suspension because he was placed off duty for bringing the "Going Postal" book to the DMU. Stotler grieved the 14-day

-26-

suspension, but did not show that it was reversed or mitigated, so the February 19, 2003 suspension remained on Stotler's record for disciplinary purposes.  Even if that incident were disregarded, however, "it would not change the outcome of this decision."  Judge Albornoz found that the agency proved its charge, and the MSPB had no reason to substitute its judgment on penalty, when the agency has selected the maximum reasonable penalty under law.

Turning to the elements of proof, the agency was required to prove three elements by a preponderance of the evidence:  "(1) the employee actually committed the charged conduct; (2) a sufficient nexus exists between the conduct and the efficiency of the Agency; and (3) the penalty is reasonable."  *Warren v. United States Postal Serv.*, No. 04-3461, 2005 WL 1903838 (Fed. Cir., Aug. 4, 2005) (citing *Pope v. U.S. Postal Service*, 114 F.3d 1144, 1147 (Fed. Cir. 1997)).  The administrative record establishes that the defendant met this burden.

*(1) Stotler actually committed the charged conduct.*  The record shows that Stotler (a) used a Postal Service computer during work hours to access pornography; (b) was AWOL after leaving his shift early without permission; (c) hung a poster entitled "Stamp Out Ratting Month" at the DMU at Cabela's, offending and alarming other employees; (d) made an inappropriate gesture at a Cabela's employee; and (e) brought a book to work entitled "Going Postal: The Tip of the Iceberg," which offended and alarmed other employees.  In finding that the agency met its burden of proof, Judge Albornoz wrote:

> The facts are essentially undisputed. The appellant acknowledged that he posted signs entitled, "Stop Ratting Out Month," at the DMU on Cabela's

-27-

property on February 13, 2003. Further, the appellant acknowledged that he brought a book entitled, "Going Postal," to the DMU on February 19, 2003, showed the book to [co-worker] Runge, and asked her to read it. Of note, Runge is one of the employees that the appellant believed made negative statements about him to Deal.  The agency charged that this type of conduct is unacceptable, and I agree.

The appellant has acknowledged to both Deal and Duba, and in his testimony, that he intended to force his coworkers to "stop" sending notes to Deal. Therefore, I find that the appellant posted the "Stop Ratting Out Month" signs at the DMU and brought the "Going Postal" book to the DMU in order to intimidate or change the behavior of his coworkers. This conduct is unacceptable. The content of the book is not at issue. Perhaps the content of the book was harmless. The fact that the appellant flaunted the title of the book in the workplace in order to cause a reaction, intimidate, or change the behavior of his coworkers is the wrong that the agency has charged.

(AR 496).  The judge concluded that the agency showed by a preponderance of the evidence, and based on Stotler's own testimony, that Stotler intended to use the "Stop Ratting Out Month" poster and the "Going Postal" book to intimidate and change the behavior of his co-workers.  She further concluded that Stotler's First Amendment right to free speech was not implicated because this "speech," i.e., hanging the "Ratting Out Month" poster, did not address any matter of public concern.  Turning to Stotler's contention that he had a First Amendment right to bring the book "Going Postal" to work and read it during his break and lunch, the agency had a justifiable reason to take disciplinary action because Stotler's actions in this regard were, as he admitted, intended only to harass and intimidate his coworkers. Thus, the First Amendment did not preclude the disciplinary action.

Noting that an agency's personnel actions may not be made based on the exercise of any appeal, complaint, or grievance right granted by law, rule, or regulation, *see* 5 U.S.C. §

2392(b), Judge Albornoz noted that Stotler had filed various grievances and Duba was aware of his protected activities. "However, [Stotler] has failed to meet his burden of showing by preponderant evidence that Duba's motivating or substantial reason for taking the removal action was [Stotler's] having filed grievances." Rather, Duba removed Stotler based on the seriousness of his conduct, his prior discipline, and the lack of mitigating factors. In fact, Duba had encouraged Stotler to address his complaints about Deborah Deal through grievance procedures. The substance of the charge showed that the agency's only reason for taking a removal action against Stotler was the nature of Stotler's conduct, and not for his having filed prior grievances.

(2) *Nexus Between the Conduct and the Efficiency of the Agency.* Judge Albornoz found that the agency had cause to expect its employees to refrain from unacceptable conduct in the workplace because "such conduct affects morale and production, and it disrupts and impedes the efficiency of the service." Stotler's conduct at the DMU also jeopardized the agency's business relationship with Cabela's, a major client. Thus, there was a nexus between the charged conduct and the efficiency of the USPS.

(3) *Whether the Penalty was Reasonable.* Judge Albornoz found that the charge of unacceptable conduct was serious, given Stotler's prior discipline and the fact that his work was performed at a private retail location. The USPS had a financial interest in protecting its reputation at the Cabela's DMU facility. The judge characterized the relationship between Stotler and Deal as "difficult." She considered Stotler's newly-disclosed

information that he had a medical condition (adjustment disorder with mild depression and insomnia) that was affecting his behavior. Stotler did not disclose this information to Deal at the time of his removal. Stotler began taking medication for this condition in January 2003 and did well on the medication. Thus, Judge Albornoz could not tie Stotler's misconduct to his taking of medication when the medical records showed the medication was helpful. Despite the mitigating factors that Stotler was treating his medical condition and began attending EAP counseling after his placement off duty, Stotler did not dispute the factual basis for the charges, and the charges were sustained by a preponderance of the evidence. In light of Stotler's prior discipline, the agency selected the maximum reasonable penalty. Even considering the mitigating factors, Judge Albornoz found that the agency's penalty determination "must be sustained as the maximum reasonable penalty under the circumstances."

I have nothing to add to Judge Albornoz' thorough and thoughtful analysis of Stotler's removal. I find and conclude that the MSPB's decision was based on substantial evidence, and was not arbitrary, capricious, or an abuse of discretion. Consequently, summary judgment will be entered in favor of the defendant on Stotler's appeal of the MSPB administrative decision.

## V. DECISION

For the reasons discussed above, I find that Stotler's claims under the FOIA and Privacy Act should be dismissed as moot. The documents in question have been produced,

-30-

Stotler is not entitled to an award of attorney's fees, and there is no proper basis for these claims to go forward.   The claims are ripe for dismissal under Fed. R. Civ. P. 12(b)(6).

Stotler failed to establish a prima facie case of retaliation under 42 U.S.C. § 2000e-16, as the record, even as supplemented, does not support any inference of discrimination or "hostile work environment" based on race, color, religion, sex, or national origin.   Nor has Stotler shown that the administrative decision of the MSPB was "arbitrary, capricious, an abuse of discretion, procedurally infirm, or not supported by substantial evidence."

**IT IS ORDERED:**

1.     Plaintiff's motion to supplement and/or expand the administrative record of the MSPB proceeding (Filing No. 46) is granted, and the court has considered the documents comprising motion Exhibits A, B and C.

2.     Defendant's motion to dismiss plaintiff's FOIA and Privacy Act claims as moot and for summary judgment on plaintiff's Title VII claim and claim for review of the MSPB decision is granted in its entirety.

3.     Pursuant to this Memorandum and Order, judgment will be entered in favor of the defendant and against the plaintiff.

**DATED April 10, 2006.**

                              **BY THE COURT:**

                              **s/ F.A. Gossett**
                              **United States Magistrate Judge**